# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 14, 2013

## GEORGE ANTHONY BRADDOCK v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Houston County**
**No. 4352     Robert E. Burch, Judge**

---

**No. M2012-01605-CCA-R3-PC - Filed February 11, 2014**

---

The petitioner, George Anthony Braddock, appeals the denial of his petition for post-conviction relief. The petitioner was convicted of first degree premeditated murder and sentenced to life in prison. On appeal, he contends that the denial of his petition was in error because he was denied his right to the effective assistance of counsel. Specifically, he contends that trial counsel was ineffective by: (1) failing to investigate the petitioner's psychological, mental, and physical health history and to present proof of such at trial in an attempt to negate the petitioner's culpable mental state; (2) failing to file a motion to suppress the petitioner's statement to law enforcement; and (3) failing to fulfill his duty of loyalty and to zealously advocate on behalf of the petitioner because of a familial relationship with the district attorney general. Following review of the record, we conclude that the petition was properly denied and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined. THOMAS T. WOODALL not participating.

Mark C. Odle, Dickson, Tennessee, for the appellant, George Anthony Braddock.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Dan M. Alsobrooks, District Attorney General; and Suzanne Lockert Mash, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Procedural History/Factual Background

The facts supporting the petitioner's first degree premeditated murder conviction, as recited by this court on direct appeal, are as follows:

[The petitioner] and the victim . . . were husband and wife. In the fall of 2004, the couple and their two children were living in Houston County, Tennessee in a home owned by the victim's father. [The victim] was the primary wage earner in the family. At that time, she was working at the Southern Aire Restaurant in Houston County. [The petitioner] worked off and on, performing mostly odd jobs.

While working at Southern Aire, [the victim] became close friends with another employee, Adam Powell. The friendship eventually developed into an extramarital affair. [The victim] often stayed late at work at the restaurant, spending time with Mr. Powell. Additionally, the two went on several out of town trips together.

After some time, [the petitioner] began to suspect that there was something going on between his wife and Mr. Powell. [The petitioner] personally witnessed [the victim] and Mr. Powell hanging out at the restaurant together after hours and drinking together at Mr. Powell's residence.

[The victim] eventually quit her job at the restaurant after [the petitioner] told her not to spend any more time with Mr. Powell. [The victim's] mother, Dorothy Hadley, provided money to support the couple after [the victim] quit her job. In fact, Mrs. Hadley sold a rifle to Mr. Powell in order to provide money to [the victim] and [the petitioner]. [The petitioner] was angered when he found out that Mr. Powell brought [sic] the rifle, vowing to have his own pistol back into the house by the next weekend.

[The victim] continued her relationship with Mr. Powell after quitting her job. However, [the victim] told Mr. Powell that she wanted to stay in her marriage. Mr. Powell "wanted the truth of the matter," so he went to the Braddock residence to discuss the matter with [the petitioner]. The two men got into an argument during which Mr. Powell sprayed [the petitioner] with pepper spray. Mr. Powell claimed that he sprayed [the petitioner] because he was afraid that [the petitioner] was armed.

The weekend before [the victim] was murdered, her sister Kimberly Tolley came to visit from Carroll County. The Saturday before her death, [the victim] played cards with her father, sister, brother-in-law, cousin, and

-2-

children at her father's home. [The victim] and her sister walked to a nearby store to buy beer. Mr. Powell's uncle was at the store and purchased a beer for the victim. [The petitioner] was upset when he learned who bought the victim the beer. Later that evening, [the petitioner] and the victim rode in their car with the victim's sister to a boat dock at a nearby lake. [The petitioner] and the victim were arguing. [The petitioner] started driving very recklessly as the two argued. [The petitioner] only stopped when Mrs. Tolley and [the victim] were upset and crying. When they got back to [the victim's] father's house, [the petitioner] went home, and [the victim] and Ms. Tolley went to visit Mr. Powell.

Sunday morning, [the petitioner] called his mother, Edith Braddock, to tell her that his children wanted to come stay with her at her house. [The petitioner's] mother arrived that afternoon and left with the grandchildren after approximately one hour.

That afternoon, [the petitioner, the victim,] and the victim's cousin, Phillip Stewart, watched a movie together. [The petitioner] repeatedly asked the victim if she wanted to go for a ride so that they could talk. Mr. Stewart thought that this was odd behavior, as [the petitioner] rarely left the house.

Mr. Stewart fell asleep during the movie. [The petitioner] and [the victim] left the house. [The petitioner] retrieved his pistol from the bedroom and placed it in the waistband of his pants before they left in the car. [The petitioner] and [the victim] drove to a boat dock first then drove to a remote swimming area on a nearby creek. As they sat in the car, [the petitioner] asked [the victim] about her relationship with Mr. Powell. [The petitioner] claimed that he was trying to get [the victim] in a "romantic mood," but continued to question her about her relationship with Mr. Powell. At some point, [the petitioner] and [the victim] got out of the car. [The petitioner] took out his pistol, placed a bullet in the chamber, and put the gun to his head when [the victim] would not answer his questions about Mr. Powell. [The petitioner] claimed at trial that [the victim] was about twenty feet away from him at the time and that it was dark. [The petitioner] stated that he could make out her figure from that distance. [The petitioner] told [the victim] that he was going to kill himself. [The victim] started to walk toward him but stopped when she was about eight or nine feet away. According to [the petitioner's] testimony at trial, [the victim] told him to "go ahead, now she and the kids could be with Adam Powell." [The petitioner] testified that he merely "reacted" and "fired the gun in that direction." While on the stand, [the petitioner] testified that he

-3-

did not know where he shot the victim, did not feel for a pulse, and ran to the car.

Immediately after the shooting, [the petitioner] left the area and took [the victim's] car to an airport where he left it behind an outbuilding. [The petitioner] walked home. Mr. Stewart was still at the residence. [The petitioner] asked Mr. Stewart if he had seen the victim. [The petitioner] told Mr. Stewart to "tell [the victim] to keep her ass there" if he saw her. [The petitioner] got a duffel bag that was already packed with clothing. He put a carton of cigarettes in the bag and loaded the bag and some speakers into the car before taking off. [The petitioner] drove to his mother's house in Covington, Tennessee arriving there sometime in the middle of the night.

On Monday, October 11, [the petitioner] called the Houston County Sheriff's Department. [The petitioner] used a fake name and told Deputy Jason Laxton that he needed to look for something along the creek bank. The majority of the telephone call was taped. Deputy Laxton recognized [the petitioner's] voice during the conversation. Later during the call, [the petitioner] admitted that he shot his wife in the head and left her body on the creek bank.

[The petitioner] called the sheriff's department a second time, from a pay phone in Tipton County. The authorities traced the call, and [the petitioner] was arrested after a brief pursuit. [The petitioner] later told authorities that he threw his weapon out of the window of the car during the pursuit. . . .

Agent Derek Jones of the Tennessee Bureau of Investigation ("TBI") responded to the creek bank. [The victim] was found lying on the creek bank with a single gunshot wound to the right side of her head. The victim was holding a pack of cigarettes in her right hand and a single shell casing was found near the body. Donna McWhorter, a person that lived near the area of the creek, stated that around 6:00 p.m. she and her husband heard a single gunshot and had seen a vehicle in the area which matched the description of the victim's vehicle.

Dr. Thomas Deering, the assistant medical examiner, testified at trial. According to Dr. Deering, the victim had soot and gun powder stipple around the gunshot wound in her right temple. This indicated that the weapon was fired from approximately six inches away.

At trial, [the petitioner] claimed that he only took the pistol to the creek to threaten his own life, not to kill [the victim]. [The petitioner] hid the pistol in the waistband of his pants when the two left the house because if [the victim] decided that she wanted to be with Mr. Powell, [the petitioner] was going to "shoot" himself. He had threatened his own life several times and never had any intentions of hurting [the victim]. [The petitioner] also claimed that he always kept a bag of clothing packed because he frequently went to his mother's house.

*State v. George Anthony Braddock*, No. M2008-00647-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 341, *1-9 (Tenn. Crim. App., May 12, 2009). Based upon his actions, the petitioner was indicted by a Houston County grand jury for one count of premeditated first degree murder.

In October 2007, the case proceeded to trial. The theory of defense pursued was one of a lesser-included offense, specifically manslaughter. The petitioner testified in support of that theory, despite the fact that his testimony at trial varied significantly from a statement that he had given to police following his arrest. Trial counsel also introduced evidence through the petitioner and his mother's testimony, as well as various other witnesses, that the petitioner suffered from various mental deficiencies. After all the evidence was presented, the jury found the petitioner guilty as charged. He was subsequently sentenced to a term of life imprisonment. Following the denial of his motion for a new trial, the petitioner appealed to this court for review. The only issue reviewed was sufficiency of the evidence. *Id*. at *1. After reviewing the record, this court affirmed the petitioner's conviction, and the Tennessee Supreme Court denied permission to appeal.

On September 17, 2010, the petitioner filed a pro se petition for post-conviction relief contending that trial counsel was ineffective for: (1) failing to investigate the petitioner's mental health issues and previous medical records in order to mitigate the culpable mental state; (2) failing to call expert witnesses to testify regarding the petitioner's mental health and depression issues; (3) failing to stand on the motion for judgment of acquittal; and (4) cumulative effect of the various errors. Following the appointment of counsel, two amended petitions for relief were filed that alleged various issues, two of which were: (1) that trial counsel was ineffective for failing to file a motion to suppress the petitioner's statement to law enforcement; and (2) whether the familial relationship, specifically first cousins, between trial counsel and the district attorney general in the case created a conflict of interest which precluded trial counsel from zealously advocating for the petitioner. Following various delays that resulted from problems assembling the record, an evidentiary hearing was held on May 1, 2012. At the hearing, trial counsel, the petitioner, the petitioner's mother, and the petitioner's sister testified.

Trial counsel testified that he is the District Public Defender and that he was appointed to represent the petitioner in this case shortly after his arrest and continued to do so through the direct appeal. Trial counsel testified that he was aware that the petitioner suffered from multiple sclerosis and, because of his physical condition, had an emergency transfer hearing which resulted in the petitioner being moved to the Charles Bass Correction Complex, where most of their numerous pre-trial meetings occurred. Trial counsel stated that he was aware of the fact that the petitioner had a history of mental health issues and threatening to commit suicide. Trial counsel stated that it was apparent that the petitioner had some intellectual issues and that he seemed to have issues understanding what was communicated to him. As a result, trial counsel did speak with the petitioner's mother and sister about the petitioner's condition.

Trial counsel relayed that the petitioner's mother was very articulate in conveying the petitioner's history and that he spoke with her on several occasions. She informed him about the petitioner's habit of threatening suicide, his intelligence issues, and problems in school. Trial counsel also testified that the petitioner's mother described the effects of the multiple sclerosis, which included loss of feeling, and how that disease caused problems with the petitioner maintaining employment. The petitioner's mother also relayed an incident from when the petitioner was a teenager, and she took him to the health department because he was threatening suicide. Because of the threats of self-harm, the defendant was sent to the Memphis Mental Health Institution and evaluated. Trial counsel did not obtain the records from that institution. Eight months after trial counsel began representing the petitioner, the records were destroyed. He testified that he could only assume that the records might have been helpful because he actually never saw them.

Trial counsel related that he did obtain records from the Professional Care Service of West Tennessee. In the summary of that report, Dr. Jorge Leal noted that the petitioner had complaints of depression and anxiety, as well as an amphetamine abuse problem. He was diagnosed with adjustment disorder, depression, drug abuse, and an anti-social personality disorder. The petitioner sought treatment there on a second occasion and was treated by Dr. David Knott for complaints of depression, suicidal thoughts, and decreased libido. The doctor observed that the petitioner's impulse control and judgment were "fair." The petitioner was diagnosed with major depressive disorder and given medication. The records reflect that the petitioner was seen a third time by Dr. Leal and diagnosed with depression, substance-induced mood disorder, substance-induced psychotic disorder, and a delusional disorder. Dr. Leal concluded that the petitioner's judgment was "poor." He was prescribed additional medication.

Trial counsel acknowledged that parts of these records would be relevant and beneficial in assessing the petitioner's defense strategy. However, he felt that some of the

information was extremely damaging. Particularly, trial counsel felt that the information that some of the petitioner's problems were caused by voluntary drug usage would not be well received by the jury. He noted that they were relevant to consider in the investigation but that he still felt that the damaging aspects would preclude their use at trial.

Post-conviction counsel then questioned trial counsel about some of the petitioner's mental and physical health records which he did not obtain, including some showing the diagnosis of multiple sclerosis and seizures. Trial counsel testified that while the records might have contributed to a diminished capacity defense or possibly even a lesser-included offense defense, he did not believe it would have been advantageous to allow the State to have evidence that the petitioner's conditions included drug-induced psychosis. While these various records might have been relevant and helped in some aspects, he felt that it was only true if he were able to "pick and choose" what information in the records to use. As that was not possible, he could not conclude that the weight of the potentially useful information outweighed the damaging aspects. Trial counsel did not agree that the records would have altered the result of the trial. With regard to one set of records, those from Saint Francis Hospital, trial counsel could not recall if the petitioner ever informed him that he received treatment there. The records reflected a diagnosis of multiple sclerosis and a history of seizures. Regardless, trial counsel still did not believe that the records would have made a difference in the case, especially in light of the fact that the State was not contesting either diagnosis. Lastly, trial counsel testified that he was aware that the petitioner had applied for social security disability but could not recall if the petitioner had been approved prior to trial. Again, trial counsel did not believe such information was important to the petitioner's case. He stated that he saw no evidence of any type of a diagnosis of a severe mental disease or defect in any of the record reviewed at the hearing.

Trial counsel stated that he did consider the defense of diminished capacity because of the petitioner's mental issues. He also considered the mental issues relevant in his consideration of pursuing a lesser-included manslaughter conviction defense. After interviewing the petitioner's mother and sister and obtaining some of the petitioner's previous medical records, trial counsel filed an ex parte motion to hire Dr. Bernet, a mental health expert from Vanderbilt Medical Center. An evaluation was performed. The preliminary report concluded that the petitioner might have significant brain damage or dysfunction, had an IQ of 71, a psychotic disorder, substance dependence, and was intoxicated at the time of the murder. The report also noted a history of family violence and physical abuse. The report did note that the petitioner might not have had the ability to form premeditation at the time of the murder. It advised that further testing should be conducted, including gathering a detailed history of the petitioner and his family.

Trial counsel acknowledged that he sought no further testing of the petitioner. He

testified that he did not do so because, while the report did state the above in its preliminary conclusion, it ultimately opined that the petitioner was untruthful and malingering. Trial counsel felt that fact could be extremely detrimental to the defense of the petitioner. Moreover, trial counsel testified that because of statements the petitioner made to him, he was ethically hampered from pursuing the defense.

After review and discussion with the petitioner, trial counsel made a specific choice not to proceed on the basis of diminished capacity in the case. He explained that the decision was based in part on Dr. Bernet's report and a review of certain medical records. Trial counsel also testified that the decision was affected by his own conversations with the petitioner in which he believed that the petitioner was malingering. For instance, despite telling Dr. Bernet in preparation for the report that he was intoxicated at the time of the murder, trial counsel testified that the petitioner told him that he was not. He made the following statement:

> It was apparent to me, based on the initial report that anything they developed further - if we used it would also bring in the information where he was malingering and lying. I felt that would be detrimental also based on statements made to me by my client - I could not allow an expert to testify in regard to [the petitioner's] saying that he was impaired at the time the shooting took place. I could not ethically allow that based on statements [the petitioner] made to me nor could I put on proof or argue that he had diminished capacity at the time.

After much discussion with the petitioner, trial counsel made the decision to pursue a defense seeking a conviction for voluntary manslaughter. He believed that it was a classic case for such a defense. He planned to suggest that the petitioner was threatening suicide in order to get the victim to stop seeing her lover. When the victim told him to go ahead and kill himself so that she could be with Mr. Powell and the children, the petitioner snapped and killed his wife without thinking. The defense was to negate premeditation. Trial counsel stated that he believed the defense would have been successful up to the point that the petitioner testified that he had chambered a round prior to the killing. That particular statement was never made prior to trial despite extreme preparation for the petitioner's testimony. While presenting no documentary proof, trial counsel did seek to make the jury aware of the petitioner's physical and mental conditions.

Trial counsel also testified that the petitioner gave a statement to the TBI, which included incriminating statements, specifically that the shooting was accidental. The forensic evidence did not support that statement. Prior to giving the statement to TBI agents, the petitioner did sign a waiver of rights. Trial counsel agreed that waiver would not be effective

if it was not given knowingly and voluntarily. However, he saw no basis to file a motion to suppress. Although the petitioner lied in part of the statement, he was able to give a lengthy narrative in chronological order of what occurred. Trial counsel testified that if a defendant can give a narrative, it is considered a voluntary statement. Moreover, trial counsel testified that the statement contained information which he wanted the jury to hear. Other than the statement saying the shooting was accidental, which showed the petitioner was lying, he felt the information was beneficial to the petitioner's case.

Trial counsel also testified that he and the district attorney general who handled this case are first cousins. He indicated that they grew up together and were fairly close. However, trial counsel stated that, while in the courtroom, his first and foremost duty and loyalty was to his client. Trial counsel noted that the petitioner was made aware of the relationship and did express concern. Trial counsel explained to the petitioner that he would do the job he was appointed to do. He informed the petitioner that he and the district attorney general had "done battle" many times in court. Trial counsel informed the petitioner that he had sometimes made the district attorney general extremely angry and alienated her in court at times. Trial counsel testified that he also had other public defenders speak with the petitioner about the situation. Afterwards, the petitioner appeared satisfied, and the representation continued. Trial counsel stated that he did not believe a conflict existed because he had no divided loyalty whatsoever with respect to the case. He opined that, in trial, "she is not family."

Next, trial counsel was questioned about his failure to object to certain questions at trial. He testified that he either saw no reasonable basis for objecting or that he saw no advantage in doing so. He also testified that he purposely chose not to cross-examine Phillip Stewart because he felt it best "not to touch it any more." He stated that he had no facts or any way to attempt to prove that Mr. Stewart was lying in his testimony.

Trial counsel did move for a judgment of acquittal at the close of the State's case. However, he did not stand on the motion, *i.e.*, he presented defense proof instead. He testified that he felt that he needed to present proof to attempt to repair the damage done by the State's proof. He continued and noted that the failure to stand on the motion did not harm the petitioner because the trial court could still act as the thirteenth juror following the presentation of all proof.

Edith Braddock, the petitioner's mother, testified that the petitioner struggled in school and had problems comprehending information which was relayed to him. According to Ms. Braddock, he only completed the eighth grade before dropping out of school. In addition to his significant academic problems, she also testified that the petitioner had trouble getting along with people. She stated that the petitioner did not see things like other people

did and that when communicating with him, it must be done on a very basic level. She testified that she made trial counsel aware that the petitioner had problems understanding questions.

Ms. Braddock related that her husband was an alcoholic and that there was often violence in the home when the petitioner was growing up. She also testified that the petitioner was often depressed and threatened to "hurt himself" on occasion. After one such time, Ms. Braddock took the petitioner to the local health department for help. Upon learning that the petitioner was threatening harm to himself, he was placed in the Memphis Mental Health facility for his own safety.

At some point during his marriage, following his diagnosis with multiple sclerosis, the petitioner related to his mother that he was experiencing sexual difficulties. Ms. Braddock testified that the petitioner told her that he could not perform sexually and that the victim was upset about it. The petitioner asked his mother to speak with the victim, which she did.

Ms. Braddock testified that she spoke with trial counsel on multiple occasions. She testified that she conveyed the information about the petitioner's various problems and treatments which had been undertaken to trial counsel. She testified that they did discuss the petitioner's defense, and she knew that they were going to attempt to get a manslaughter conviction. Ms. Braddock was aware of the evaluation done by Dr. Bernet, but trial counsel told her that they would not be using it at trial. She stated that she was never asked to speak with Dr. Bernet to provide additional information.

The petitioner's sister, Laura Harris, also testified at the hearing. She likewise testified that the petitioner had problems in school and with understanding things. She recalled meeting with trial counsel on one occasion, along with her parents. Ms. Harris testified that they discussed their family life in general. She could not recall specific instances of the petitioner receiving mental health treatment. Ms. Harris further testified that she was never contacted to speak with Dr. Bernet or asked to provide additional information on their family history.

The final witness to testify was the petitioner himself. He stated that he had applied for, and was eventually approved for, social security disability on the basis of his multiple sclerosis, depression, seizures, and mental disease. The petitioner was confused as to when he was actually approved for disability and "thinks" that he told trial counsel about it. He testified that he did tell trial counsel about multiple instances of treatment for his various ailments over the years. The petitioner also testified that he told trial counsel that he was using illegal drugs at the time of the shooting.

-10-

The petitioner testified that he made trial counsel aware that he had only completed a few months of the ninth grade because it was difficult for him. He testified that he had trouble reading and understanding what was told to him.

The petitioner was unable to recall if he and trial counsel discussed the petitioner's statement to police. He was also unable to recall being taken to Vanderbilt for an evaluation, although he did not deny that one was done. He testified that he was unaware of the fact that Dr. Bernet had requested additional information following the preliminary testing. Despite the fact that the petitioner could not recall the evaluation, he denied that he had lied to Dr. Bernet during the test.

The petitioner also acknowledged that he knew prior to trial that trial counsel and the district attorney general were cousins. He testified that when trial counsel informed him of this, he did not really like it. He stated that he felt that because trial counsel was a lawyer, he should have "stepped away." He also stated that he was concerned about trial counsel's loyalty to him. The petitioner testified that he did inform trial counsel of his concerns over the issue, and it was discussed. Although he never specifically told trial counsel that he wanted a new attorney, he claims that he was not satisfied. The petitioner stated that he did not ask for a new attorney because he was not aware that he could do so.

After hearing the evidence presented, the post-conviction court took the matter under advisement. Thereafter, the court entered a written order denying relief. The petitioner has timely appealed that denial.

**Analysis**

On appeal, the petitioner asserts that he was denied his right to the effective assistance of counsel in three ways: (1) trial counsel's failure to adequately investigate and present proof of the petitioner's psychological, mental, and physical health to negate the culpable mental state; (2) trial counsel's failure to file a motion to suppress the petitioner's statements; and (3) trial counsel's failure to advocate zealously for the petitioner because of his familial relationship with the district attorney general. In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103 (2010); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*,

983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687-88. Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

For deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 688-89. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigation must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Burns*, 6 S.W.3d at 462 (quoting *Strickland*, 466 U.S. at 691). "[W]hen a defendant has

-12-

given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. "Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 432-32.

Prejudice in turn requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Strickland*, the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. The court clarified that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. But the trial court's conclusions of law on the claim are reviewed under a purely de novo standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

## I. Failure to Investigate and Present Evidence of Psychological and Physical Health

As his first alleged ground for ineffective assistance of counsel, the petitioner contends that trial counsel failed to adequately investigate and present proof at trial of the petitioner's mental and physical health history, including the presentment of expert witness to negate the petitioner's culpable mental state and lessen the degree of homicide. In addressing this issue in its order denying relief, the post-conviction court stated as follows:

> Petitioner has presented only his medical records of his medical condition at various times preceding the commission of the crime. Nothing in the records relates Petitioner's lack of capacity to form the requisite culpable mental intent necessary to establish the element of premeditation. Petitioner failed to present any expert testimony at the evidentiary hearing that he lacked the requisite culpable mental state necessary to establish the element of premeditation. When the medical reports did not include a finding that a

-13-

defendant lacked the capacity to form the intent to commit the crime due to mental disease or defect, the reports are not admissible for that purpose and are inadequate to establish lack of capacity. . . .

This being the case, Petitioner has failed to produce at the evidentiary hearing any evidence of his lack of capacity to form the essential element of premeditation.

With regard to trial counsel's failure to call expert witnesses, the trial court found that the petitioner had failed to establish prejudice by failing to call such witnesses himself. *See Denton v. State*, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)).

In his brief, the petitioner is somewhat unclear as to whether he is faulting trial counsel for failure to investigate this evidence in support of a diminished capacity defense or in conjunction with the chosen defense of pursuing a lesser-included offense. The standard of admissibility of diminished capacity type evidence was succinctly coined in *State v. Hall*, 958 S.W.2d 679, 689 (1997):

To gain admissibility, expert testimony regarding a defendant's incapacity to form the required mental state must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony. Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of a mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law.

The testimony "must demonstrate" that the claimed inability to form the culpable mental state was "the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of a lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert mental testimony on the issue." *Id*. at 690. If the expert testimony does not show this fact, it is not admissible.

The petitioner in this case has failed to present evidence which establishes the existence of a mental disease or defect which prohibited him from forming the requisite intent, absent Dr. Bernet's report which stated that the petitioner *might* not be able to form premeditation. Trial counsel testified that he saw nothing in the medical records presented which would indicate that a mental disease or defect existed which precluded the petitioner from forming premeditation. The post-conviction court reached the same conclusion after

-14-

reviewing the record, and we must agree. While it is clear that the petitioner had an unfortunate health history and a troubled mental background, none of that establishes that he was incapable of forming premeditation- thus, no causal connection was established.

Trial counsel made an investigation into the petitioner's mental and physical health history. He spoke with the petitioner's mother and reviewed certain records. He had the petitioner evaluated by a leading psychologist in the area. However, after that review, he did not believe that the defense of diminished capacity was supported and chose to pursue a lesser-included offense defense. In pursuit of that defense, trial counsel did present much of the information regarding the petitioner's health before the jury, albeit not the actual documentation.

Contrary to the conclusion reached by the post-conviction court that the petitioner had failed to establish a mental defect or disease precluding the formation of intent, the petitioner asserts that the records themselves do establish that and that no expert was necessary. We disagree. He simply failed to establish his claim in post-conviction. The records before us are simply insufficient to establish a causal link as to how the mental disease or defect precluded the petitioner from forming the intent to murder his wife on the evening of the shooting. Because no evidence or expert was presented to establish that link, a finding of prejudice is foreclosed. *See Black*, 794 S.W.2d at 757. Thus, the petitioner is entitled to no relief.

Although not necessary to the determination of this case because of the above prejudice finding, we would acknowledge that the question of deficient performance in this case is much closer based upon trial counsel's failure to follow-up on the recommendations in Dr. Bernet's report with regard to the possibility that the petitioner *might* not have been able to form premeditation. However, when reviewing trial counsel's performance in this case, we must do so in light of the circumstances as trial counsel perceived them to be at the time. *Hellard*, 629 S.W.2d at 9. Our review must be highly deferential with a strong presumption that counsel's performance was within the wide range of reasonable professional assistance. *Burns*, 6 S.W.3d at 462. "However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *Goad*, 938 S.W.2d at 369.

To succeed on the deficient performance prong, the petitioner would be required to establish that trial counsel made an unreasonable decision not to pursue or investigate his mental condition further. On this record, that cannot be established. The proof at trial reflects that trial counsel made an investigation in this case. He did review some records and spoke with the petitioner's family about his various conditions. Trial counsel testified that he did not pursue the report further because of his own belief that the petitioner had been

malingering with Dr. Bernet based upon the petitioner's behavior, as well as ethical considerations which would not allow trial counsel to advance the defense. Therefore, the decision was made to pursue a lesser-included offense defense. This appears to be more of a strategical decision made by trial counsel rather than a lack of competence. From the evidence presented, it appears that trial counsel reasonably investigated the petitioner's mental health history, presented some proof to that effect to negate the mens rea of premeditation at trial, and ultimately determined against offering certain mental health evidence because he believed it was unethical to do so.

## II. Failure to File a Motion to Suppress

The petitioner also contends that trial counsel was ineffective by failing to file a motion to suppress the statement given to law enforcement by the petitioner regarding the shooting. On appeal, the petitioner argues that, because of his mental deficiencies, he was incapable of "voluntarily, knowingly and intelligently" waiving his right against self-incrimination and that the statement should have been suppressed accordingly. In support of his argument, he relies upon the following facts: (1) that his IQ was 71, which placed him in the lower end of borderline intellectual functions; (2) medical records which reflect diagnoses of depression, poor judgment, delusional disorder, seizure disorder, and multiple sclerosis; and (3) testimony from his mother that the petitioner had difficulty understanding and comprehending questions and that he dropped out of school in the 9th grade.

As noted by the post-conviction court, no motion to suppress was contained in the record because none was filed. Additionally, the court noted that neither the petition for relief nor its amendments specified upon what grounds trial counsel should have filed the motion to suppress. In its order, the post-conviction court presumed that the petitioner was asserting as grounds for the motion that his mental conditions rendered the statement inadmissible. The court addressed the issue as such. In denying relief upon this ground, the post-conviction court found:

> In the case *sub judice*, Petitioner was 27 years of age at the time of his confession. He finished the eight grade. His literacy skills were on the low side of adequate. He had had no prior experience with the criminal justice system. His demeanor was such that he understood the proceedings in which he participated and was able to give knowing and intelligent answers to the questions posed to him. Although there was some testimony concerning malingering, there was no direct evidence of this finding presented at the evidentiary hearing. The manner in which Petitioner's Miranda rights were explained to him could have been more thorough given Petitioner's obvious limited literacy skills but was adequate to inform Petitioner of his rights and

-16-

to ensure that his statement was voluntary. The proof establishes that Petitioner was able to drive, hold down a job (at least on a sporadic basis) and otherwise function in society on a day-to-day basis.

Likewise, a low I.Q. does not render a defendant incapable of making a voluntary statement to law enforcement.

In *Gwinn v. State*, 595 S.W.2d 832 (Tenn. Crim. App. 1979), the Court of Criminal Appeals found a confession admissible under facts very similar to the present case. In *Gwinn*, the defendant had an I.Q. of fifty, "comparable to that of a third grade child." *Id*. at 834. Gwinn could not read or write, other than to sign his name. The Court upheld the trial court's finding that the confession was admissible.

In the unreported case of *State v. Roscoe Leonard Perry*, the Court of Criminal Appeals stated the proper test of the voluntariness of a defendant with a low I.Q. (in that case, the defendant's I.Q. was 30), "Overall, the defendant's statement is clear and reasonably intelligible. Unquestionably, it shows that the statement was voluntarily given without any threats, promises, or coercion." *State v. Roscoe Leonard Perry*, (unreported), Tenn. Crim. App. at Knoxville 1987 LEXIS 2560 opinion filed April 14, 1987.

This being the case, Petitioner's mental state and low intelligence level did not render his statement to law enforcement inadmissible. This Court finds that the proof establishes that Petitioner understood his Miranda rights as explained to him and made a knowing and voluntary statement to law enforcement.

This issue is without merit.

Following review of the record, we find nothing which preponderates against the post-conviction court's detailed conclusions. Trial counsel testified that he felt there was no basis for filing such a motion. He noted the petitioner's ability to give a complete and chronological accounting of the murder, albeit partially untrue. As found by the post-conviction court, the petitioner has failed to establish that his intelligence level was such that his statement would have been rendered inadmissable. Moreover, trial counsel specifically testified that, as a matter of strategy, he wanted the statement admitted into evidence. Despite the partial untruth, he felt that the contents of the statement were beneficial to the theory of defense which was pursued. As previously noted, this court does not second-guess the strategic decision made by counsel. *See Hellard*, 629 S.W. 4, 9 (Tenn. 1982). The

-17-

petitioner is entitled to no relief.

## III. Familial Relationship/Duty to Zealously Advocate

Finally, the petitioner contends that he received ineffective assistance of counsel due to trial counsel's familial relationship with the district attorney general, which he claims created a conflict of interest that affected his representation of the petitioner. Specifically, the petitioner contends that trial counsel's duty of loyalty and duty to advocate zealously on behalf of the petitioner were affected. Additionally, he asserts that the existence of the familiar relationship between the two gave the appearance of impropriety, "especially in light of the fact that they were opposing counsel in a first degree murder trial." He contends that the obvious adverse effect "is evidenced in [trial counsel's] failure to investigate [the petitioner's] psychological and physical health history, and present proof regarding the same at trial . . .[, as well as his] failure to file a motion to suppress. We disagree.

An accused has a constitutional right to the effective assistance of counsel at all critical stages of a criminal prosecution. Tenn. Const. art. I, § 9. This right contemplates that the services rendered by counsel shall be completely devoted to the interest of the accused. *State v. Knight*, 770 S.W.2d 771, 775 (Tenn. Crim. App. 1988). In this respect, it is unquestioned that "an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest." *State v. Thompson*, 768 S.W.2d 239, 245 (Tenn. 1989).

Before a petitioner may obtain post-conviction relief on the ground of a conflict of interest, he must establish by a preponderance of the evidence that: (a) an actual conflict of interest existed; and (b) the conflicting interest adversely affected the performance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980). Our supreme court has observed that "an actual conflict of interest included any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (citing *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000)). In other words, "[a]n actual conflict of interest is usually defined in the context of one attorney representing two or more parties with divergent interests. . . . The term has been described as a situation in which regard for one duty tends to lead to [the] disregard of another." *State v. Tate*, 925 S.W.2d 548, 552-53 (Tenn. Crim. App. 1995) (internal citations omitted). An actual conflict of interest may exist where an attorney is "placed in a position of divided loyalties." *Id*. at 553. This court has noted that the conflict "must be actual and significant, not irrelevant or 'merely hypothetical.'" *Charles C. Dick v. State*, No. M2007-00542-CCA-R3-PC, 2008 Tenn. Crim. App. LEXIS 735, *19-20 (Tenn. Crim. App. Sept. 19, 2008), *perm. app. denied*, (Tenn. Feb. 17, 2009) (quoting *Terrance B. Smith v. State*, No. W2004-02366-CCA-R3-PC, 2005 Tenn. Crim. App. LEXIS 1101, *14 (Tenn. Crim. App. Mar. 27, 2006).

If the petitioner demonstrates that counsel "actively represented conflicting interests" and that an "actual conflict of interest adversely affected his lawyer's performance," prejudice is presumed. *Strickland*, 466 U.S. at 692 (quoting *Cuyler*, 446 U.S. at 350). When a defendant fails to object to the representation at trial, however, he "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance," and the mere possibility of prejudice will not warrant relief. *Cuyler*, 446 U.S. at 348. "Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim." *Id*. at 349-50 (citations omitted).

In denying relief on this issue, the post-conviction court noted that it found no Tennessee case which addressed the possible conflict of interest when counsel on both sides of a lawsuit are first cousins. The court further noted that the Rules of Professional Conduct, specifically Rule 1.8(i), were the governing law at the time of the petitioner's trial. The rule provided that: "A lawyer related to another lawyer as parent, child, sibling, or spouse shall not represent a client in a representation directly adverse to a person whom the lawyer knows is represented by the other lawyer, unless the client consents in writing after consultation regarding the relationship." Thus, the court concluded, under prevailing law, the rules did not prohibit first cousins from representing adverse parties in a trial.[1] In it's findings, the court specifically stated:

> . . . In the case *sub judice*, trial counsel testified and Petitioner agreed that trial counsel disclosed to Petitioner the relationship between trial counsel and the prosecutor in Petitioner's trial early in trial counsel's representation of Petitioner.
>
> This Court has reviewed the overall performance of trial counsel in Petitioner's trial and has determined that Petitioner's trial counsel performed over and above the level of competence expected of trial counsel in a criminal proceeding. There is absolutely no indication that trial counsel's performance was in any way affected by his relationship to the prosecuting attorney. The actions of the prosecutor and Petitioner's trial counsel during Petitioner's trial could only be described as "adversarial."
>
> That being the case, merely advising Petitioner of the family relationship was sufficient. A written waiver was not needed.

---

[1]The court also analyzed the issue pursuant to the current law and reached the same conclusion.

Even if such a written waiver is required by the Rules of Profession Conduct, no prejudice has been shown by Petitioner from the lack thereof. . . . As the Court has held hereinabove, Petitioner was adequately and zealously represented by his trial counsel. No prejudice has been shown.

Our review of the record reveals nothing which preponderates against these findings. Trial counsel testified that early in the representation, the relationship was disclosed to the petitioner and, further, that it was explained to him. Trial counsel informed the petitioner that he and the district attorney general had "battled" numerous times in court and that trial counsel's loyalty would be to the petitioner. Trial counsel also testified, as did the petitioner, that new counsel was not requested. Moreover, the record of the trial in no way demonstrates a division of trial counsel's loyalties between the petitioner and the district attorney general.

We agree with the trial court's assessment of the relevant law that first cousins are not prohibited from representing opposing parties in each case. The petitioner has failed to establish in this case that an actual conflict of interest existed in his representation. We further agree that he failed to establish prejudice. As such, he is entitled to no relief.

**CONCLUSION**

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____

JOHN EVERETT WILLIAMS, JUDGE